A93A0715. WHITE v. THE STATE.
(432 SE2d 562)

BEASLEY, Presiding Judge.

White was convicted of three counts of forgery in the first degree. OCGA § 16-9-1 (a). His motion for new trial was denied.

1. White enumerates the general grounds.

The evidence showed that White approached the head cashier in the office of a supermarket in Brunswick at approximately 9:30 p.m. and sought to cash an Anheuser-Busch, Inc. payroll check in the amount of $325 made out to him. The head cashier was not authorized to approve checks over $300, and called the manager to approve the check. The head cashier testified that she was suspicious of White since, after asking her to cash the check because he needed to leave the state unexpectedly and had no money, he then asked her to

---

change some large bills. Because of her suspicion she asked a cashier who happened to be in the office to remain with her. After the manager approved the check, White went through a checkout line and left the store with a cart containing groceries.

As White was crossing the parking lot, Police Officer Rodney Fulks was approaching the store on an unrelated police matter. He observed White and returned his wave. When Fulks entered the store the cashier was looking out at the parking lot because she was waiting for a ride. She saw White run off across the parking lot, leaving his groceries in the cart. She shouted: "Go get him, he's running." The cashier then remarked to Fulks: "I bet you he cashed a bad check."

Fulks consulted the head cashier, who stated she would investigate the check, and Fulks told her he would see if he could catch White "so we can ask him about it whether he did or not." He testified that he was suspicious because White left a cart of groceries in the parking lot. Fulks rode around in the area and located White nearby, hiding under an abandoned car near some bushes. He ordered White to get up. White stood, raised his arms, and stated he was an FBI agent working undercover. Fulks called for assistance and transported White back to the store. When he arrived with White, other units had already arrived. The head cashier verified that the check was not genuine and identified White as the person who had cashed it. White was arrested for forgery, his pockets were emptied and placed in a bag for safekeeping, and after he asked to speak with a detective he was taken to the police station.

Detective Stewart testified that he advised White of his *Miranda* rights and interviewed him at the Brunswick police station that evening. White initially asked for an attorney, and questioning ceased immediately. Shortly thereafter, however, despite Stewart's protestations White demanded to be allowed to talk, rescinded his request for counsel, signed a waiver of his *Miranda* rights, and insisted on making a statement, which was recorded. White repeatedly asked that FBI Agent Egan in Jacksonville be contacted and Stewart called him in White's presence and left a message.

The transcript of the recorded statement was introduced into evidence at trial. In the statement, White admitted previous convictions for forgery and informed Stewart that he was currently participating in a forgery ring that was creating and passing checks in several states. White identified locations at which he had passed forged checks locally. Personnel from two other markets in Brunswick at which White had passed forged Anheuser-Busch payroll checks on the same day testified at trial as to those incidents. All three checks, which were identical except for the amounts, were admitted into evidence. A senior accountant at Anheuser-Busch testified that the checks passed by White did not originate at her company, were drawn

on the wrong bank, were printed on different paper than that used by the company, contained an unauthorized payor signature, and bore incorrect check numbers and routing information.

FBI Agent Egan of the white collar crime squad in Jacksonville, Florida testified that White had called him and informed him that he was working as a driver for a forgery ring. Egan acknowledged speaking with White several times on the telephone and making appointments for White to come in to be interviewed, but testified that White never kept the appointments for interviews or for a polygraph test, which had been suggested by White. He testified that White was not working and had never worked undercover for the FBI, and that he had informed White that if he participated in the ring's activities, he was committing a crime and could be arrested.

White presented no evidence in his defense.

The evidence was sufficient to authorize the jury to convict White of three counts of forgery in the first degree under the standard set forth in *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. White moved to suppress his incriminating statement on the ground that no probable cause existed for his arrest. He contends the court erred in denying his motion.

The initial stop was lawful. Fulks had personally observed White leave a cart containing groceries in the parking lot of the market. Even without any additional factors this act was sufficient to raise an articulable suspicion authorizing Fulks to try to find White and question him briefly under *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968). In addition to his observation, however, Fulks had the additional information provided by the store employees that they suspected that White had cashed a bad check. Although Fulks had no personal knowledge of that check, the information was provided by identifiable citizens who observed White's behavior and had no reason to be anything but honest about the information they gave Fulks. See *State v. McFarland*, 201 Ga. App. 495, 496 (429 SE2d 258) (1991); *State v. Ball*, 207 Ga. App. 729 (429 SE2d 130) (1993). Compare *Moreland v. State*, 204 Ga. App. 218 (418 SE2d 788) (1992); *Swanson v. State*, 201 Ga. App. 896 (412 SE2d 630) (1991), and *Johnson v. State*, 197 Ga. App. 538 (398 SE2d 826) (1990), in which the initial stops were based only on anonymous tips with no detailed information, and no additional factors were present. In these cases, we found the stops unlawful. Fulks, on the other hand, was authorized to pursue White for brief questioning.

He found White under circumstances which contributed further to his suspicions: hiding under an abandoned car, under cover of bushes. A patdown was conducted and no apparent weapons were found. Fulks called for assistance, handcuffed White for Fulks' safety,

placed White in the back of the police car, and returned to the store to complete his questioning. *Terry* carefully notes that the limitations placed upon a brief investigatory stop depended on the facts and circumstances. They would have to be developed on a case-by-case basis, with the touchstone being always the reasonableness of the officer's conduct. Noting that the officer remains particularly vulnerable during such a stop precisely *because* a full custodial arrest has not been effected, the officer must make quick decisions as to how to protect himself and others from possible danger. *Hayes v. State*, 202 Ga. App. 204, 206-207 (414 SE2d 321) (1991). In determining whether an officer's conduct during an investigatory stop was proper, the inquiry is not whether the officer *could* validly have acted similarly but whether under the same circumstances a reasonable officer *would* have done so. *Tarwid v. State*, 184 Ga. App. 853, 854 (363 SE2d 63) (1987). Given that Fulks was alone in the dark with White, whose actions were suspicious at best, that he noted White's pockets were full and believed it possible White was armed despite the cursory patdown, and that the store was but moments away, we find Fulks' actions reasonable under the circumstances, and therefore lawful as part of the investigatory stop.

When Fulks returned to the store with White, the manager confirmed that the check was forged, giving Fulks probable cause to arrest White. The court properly denied the motion to suppress.

3. White also contends the court erred by considering hearsay evidence in denying the motion to suppress. This contention is directed at Fulks' testimony that he pursued White partly because of what the cashier and head cashier, who did not testify at the motion hearing, had told him about White's actions and about the check.

"The testimony that a witness received certain information upon which he acted is admissible not as independent evidence to establish the truth of such information, but as an inducement and explanation by the witness that, acting on such information, he discovered other facts connecting the accused with the crime in question. [Cit.] Hearsay testimony may be admitted for the purpose of explaining conduct. [Cit.]" *Lloyd v. State*, 139 Ga. App. 625, 626 (2) (229 SE2d 106) (1976). At trial, "only in rare instances will the 'conduct' of an investigating officer need to be 'explained,' as in practically every case, the motive, intent, or state of mind of such an officer will not be 'matters concerning which the truth must be found.'" *Teague v. State*, 252 Ga. 534, 536 (314 SE2d 910) (1984).

The reverse is true at a hearing on a motion to suppress held outside the presence of the jury. The inquiry is whether probable cause existed for the officer's actions, so the truth concerning the officer's motive, intent, or state of mind must be discerned. See *Jones v. State*, 131 Ga. App. 699, 700 (1) (206 SE2d 601) (1974). Consideration

of the hearsay testimony was not improper.

4. White maintains the court erred in allowing a witness for the State to testify despite the State's having failed to properly notify him of the witness' correct address. USCR 30.3 requires the State to provide the defendant with a list, including addresses and telephone numbers, of its witnesses. Under OCGA § 17-7-110, a witness whose name does not appear on the list may not testify without the defendant's consent. The State's failure to meet this requirement "can be cured in many situations, however, if defendant is granted a continuance or allowed to interview the witness before the testimony is given. [Cits.]" *Rogers v. State*, 261 Ga. 649 (1) (409 SE2d 655) (1991).

The State furnished White with a witness list and provided the only address it had for the witness. The same address was provided to the sheriff for the purpose of serving a subpoena, and the sheriff located her. Even if White could not locate her, however, upon hearing White's objection the court recessed and offered White the opportunity to interview the witness during the recess before she was allowed to testify, thereby distinguishing this case from *Rogers*.

5. White contends the court erred in denying his motion for a directed verdict of acquittal on Counts 1 to 3.[1] White argues that the State failed to prove that the checks were written with a fictitious name, as alleged in the indictment.

The Anheuser-Busch senior accountant, who had been employed at the company for 17 years and was responsible for payroll and ordering checks, testified that the payor's signature on the checks was not familiar to her and was not an authorized signature. This testimony established that the signature was "fictitious." Moreover, although the appellant's name is John White, the Anheuser-Busch employee John White named as payee on the payroll check was also a fictitious person. The defendant was not and had never been an Anheuser-Busch employee and, although Anheuser-Busch did have an employee named John White, he was not appellant.

A motion for a directed verdict of acquittal should be granted only when there is no conflict in the evidence and the evidence, with all reasonable deductions and inferences therefrom, demands a verdict of "not guilty" as a matter of law. OCGA § 17-9-1 (a). The evidence as to the forgery counts did not demand such a verdict, which was properly denied.

6. White asserts error in the court's failure to grant his motion for a mistrial following two instances of improper argument by the State to the jury.

The first instance is the State's "golden rule" argument. "In a

---

[1] The court did so as to a fourth count: printing fictitious checks. OCGA § 16-9-21 (a).

classic 'golden rule' argument, jurors are invited to place themselves in the victim's place in regard to the crime itself. [Cit.] However, any argument, regardless of nomenclature, which importunes the jury to place itself in the position of the victim for any purpose must be carefully scrutinized to ensure that no infringement of the accused's fair trial rights has occurred." *Horne v. State*, 192 Ga. App. 528, 529 (2) (385 SE2d 704) (1989).

In its argument, the State stressed that the jurors alone were the judges of the credibility of the witnesses. She pointed out that many of those witnesses were citizens like the jurors and that the witnesses, "if you found yourself in that place," would not want to be there. When defendant objected, the court instructed counsel not to make such argument.

The second instance involves a claim that the State impermissibly vouched for its witnesses. The State argued to the jury that its various witnesses "had to come tell what happened" because they knew about it but that they told nothing "that was not the truth." The court overruled defendant's objection.

The prohibitions against "golden rule" arguments and bolstering the testimony of witnesses serve to prevent the introduction of extraneous matters not in evidence, which may be prejudicial, and which the jury may consider along with the properly admitted evidence. Of course, counsel's opinion as to credibility is irrelevant. Counsel are permitted to make reasonable deductions from the evidence, and upon these deductions " 'an attorney may make almost any form of argument he desires.' " *Walker v. State*, 232 Ga. 33, 37 (205 SE2d 260) (1974). After careful examination of the closing argument in its entirety, we are satisfied that the import of the prosecutor's statements during argument were not cause for mistrial. As in *Horne*, supra, the court did not manifestly abuse its discretion in denying the motions for mistrial.

7. Relying on *Lumpkin v. State*, 249 Ga. 834, 835-837 (2) (295 SE2d 86) (1982), White contends the court erred by charging the jury the entirety of OCGA § 16-9-1 (a) when the indictment charged him only with committing forgery in one specific manner of the several enumerated in the statute.

" 'The well established rule is that a charge on a code section in its entirety is not error where a part thereof is applicable and it does not appear that the inapplicable part misled the jury or erroneously affected the verdict. (Cits.)' [Cit.]" *Boscaino v. State*, 186 Ga. App. 133, 134 (366 SE2d 789) (1988). The court also instructed the jury that in order to find White guilty of any of the three counts they must believe beyond a reasonable doubt that he was guilty of the allegations as contained in the appropriate count of the indictment, which the jury could consult during its deliberations. Taken as a

whole, this charge could not have confused the jury. See *Ross v. State*, 192 Ga. App. 65, 66 (2) (383 SE2d 627) (1989).

*Judgment affirmed. McMurray, P. J., and Cooper, J., concur.*

DECIDED MAY 19, 1993 —
RECONSIDERATION DENIED JUNE 9, 1993.

*James A. Yancey, Jr.*, for appellant.

*W. Glenn Thomas, Jr., District Attorney, Carol L. Stokes, Assistant District Attorney*, for appellee